REDMANN, Chief Judge,
dissenting.
The juvenile court has, since October 21, 1983, had under its control a foreign-born infant then two years old. Since May 21, 1985, the juvenile court has refused to let the child’s foreigner parents and their two other young children even visit the child. There is in this record no evidence worthy of the name that could justify such inhumanity.
We should order that supervised visitation be restored forthwith and be conducted daily for the next three weeks, and that at that time the child Pablo be returned to Mr. and Mrs. Quan unless the state has by then proved that the Quans’ did not lawfully have the “actual” custody of Pablo at the time of their detention by the U.S. Immigration & Naturalization Service.
The only basis upon which the Juvenile Court could claim jurisdiction is that the child is “in need of care,” C.J.P. 15 C (for the child is not a delinquent nor “in need of supervision”). The child was earlier in need of care (as the Quans then agreed) because of the Quans’ detention by the INS. But that “need of care” basis is now gone, and there is no basis for holding that *603 the child is still in need of care within C.J.P. 13(14) (quoted in Judge Williams’s opinion).
C.J.P. 13(11) defines “parent” as either parent if married and living together or, if not, “a parent or person having legal or actual custody of the child. If no parent has ... custody, it means the person ... having legal or actual custody.” At the time that the Quans were detained by INS they were at least the person having actual custody of Pablo. The Code of Juvenile Procedure cannot reasonably be interpreted to allow the state at any moment to deprive a “parent” of that status by simply seizing the “actual” custody from him or her. The Code evidently and rightly intends to refuse to allow the juvenile court to intermeddle as long as children in someone’s custody are not delinquent, in need of supervision or in need of care.
The worst thing about this case is that the juvenile judge felt that, in order to have the child returned to their custody, the parents were obliged to prove something. The second worst thing is that the trial judge would not let them do so. The judge refused to allow the parents to present testimony by a Guatemalan lawyer present in court on the validity of the Quans’ purported adoption and custody, yet allowed the state to present all kinds of hearsay, apparently including a written statement by a notary in Guatemala purporting to reproduce the wording of some Guatemalan adoption statutes (that do not, in any case, purport to provide the exclusive means for adoption). Even so, it is not the burden of the Quans to prove that their “adoption” of Pablo by having his birth officially registered with their names as his parents is an accepted manner of adoption in Guatemala (as they testify), nor even that their custody of Pablo was legal custody under the law of Guatemala. They need prove nothing but that they had the actual custody of the child — which was undisputed until the “lav/” wrested their child from them. It is, it should not have to be said, the burden of the state to prove some basis for taking their child from them.
There is in the record some far-removed hearsay about Mrs. Quan being wanted by Guatemala for baby-trafficking and for murdering four persons who sought return of a child whom she sought to place for adoption (and about Mr. Quan being wanted for four NSP checks). (The Quans would now present what they did not at trial time have, namely authenticated Guatemalan police certificates that there is no criminal charge against either. I repeat it is not their burden to prove themselves unaccused in order to retain custody of their child.) Assuming that Guatemala accuses someone in this country of crime, the remedy is extradition — not to take the accused’s infant away. Or, if there has been any crime in this jurisdiction, the district attorney’s remedy is a criminal charge— not to take the accused’s infant away.
There is some evidence of the child’s being upset by visitation with the parents, especially the mother. To a considerable extent that would appear to be an expecta-ble consequence of the mother’s not seeing the child during the 13 months she was detained by INS. Moreover, much of the evidence consists of allegations of bedwet-ting and the like by the foster parents, who themselves seek to adopt Pablo and are therefore not disinterested witnesses. They are presumably most excellent and selfless persons, but they have an inbuilt if unconscious bias because of their desire to adopt Pablo.
The child’s allegedly having rickets is immaterial. The parents proved they gave medical attention to their child. The juvenile system hasn’t cured the child in almost four years that it has had him. The child’s illness is no more a justification for taking him from his parents than is his being Guatemalan.
Since the parents’ parole from detention by the Immigration and Naturalization Service, the juvenile court no longer has jurisdiction over Pablo. It should therefore return him to his parents, unless the state can prove that Pablo was not lawfully in the “actual” custody of the Quans (e.g. because a kidnap victim) when they temporarily surrendered him because of their de *604 tention by INS. The only sense in which Pablo may be “in need of care” is that he has been deprived of his “mother” for so long that he may need some time to readjust to her: but that does not meet the statutory definition without which the juvenile court does not have jurisdiction.